OPINION
By ROSS, J.
This is an appeal on questions of law and fact from a decree of the common pleas court of Hamilton county, wherein that court ordered specific performance of a contract entered into by the plaintiff and defendants requiring that such defendants transfer to the plaintiff their one-half interest in an estate; such one-half interest amounting to approximately thirteen thousand dollars; the consideration for such agreement being the sum of Five Hundred Dollars, paid by the plaintiff some two years previous to the death of the intestate.
In June, 1933, the defendants, two sisters, were in need of money. An advertisement of the plaintiff appearing in a New York newspaper came to their attention. Frances M. Callam, one of the sisters, interviewed the plaintiff and applied for a loan of Two Hundred Dollars. The plaintiff stated that such a loan could be arranged if the sisters would assign to the plaintiff an interest in the estate of their cousin, Martha C. Smith, as collateral for the repayment of the loan. Frances M. Callam conferred with her sister as to this proposition of the plaintiff and the whole matter was dropped for about one year. In- the following June, 1934, the matter was again taken up by one of the sisters with the plaintiff, who stated after a discussion with his partner he had decided to withdraw the first offer and proposed to loan the defendants Five Hundred Dollars upon a one-half interest of the defendants in the estate of their cousin being pledged to secure the repayment of the loan. Again, the matter was deferred for a conference by thei sisters.
Leila B. Callam testifies:
“I went home and saw my sister, and we were going to be put out of the place we were living in, and there was nothing to do but go back the next day and borrow the money.”
Upon the following day, Leila B. Callam said to the plaintiff:
“If the money we inherit from Miss Smith is much more than this five hundred dollars, you will do the right thing, Mr. Rosenberg?” and the plaintiff stated: “Yes,Miss Callam, I will do the right thing.”
About a year after the transaction was closed, a further conversation between the plaintiff and Leila B. Callam occurred, in which *11 'Leila said: “If there is any way in which I could manage to get a thousand dollars together and brought it to you, would you give us back our papers?” To which the plaintiff replied: “Have you the cash, Miss Callam?” On being informed she did not have the money at that time the plaintiff added: “When you have a thousand dollars, come to me and we will talk .business.”
Frances M. Callam testified she liad been seriously ill for some time previous to the date on which final arrangements were made and that at the time of the interview “I was so sick I couldn’t say any thing.” And, again, in response to a question of her attorney, asking about her illness at that time, Frances stated: “In the first place, I was hungry and I could hardly stand. We had not eaten for a week and we were out at this place and it was the most — I don’t know if anybody has ever been hungry or not, but I know I was.” She further stated she had been ill for two or three months.
The plaintiff had been given the sources from which he could obtain full information as to the character, location, and value of the possessions of Martha C. Smith. He made a full and careful investigation of these holdings. It is apparent that such investigation caused the plaintiff to conclude that the interest of the sisters would be approximately the .amount which now develops is (their interest in the estate.
The substantial character of the holdings and possessions of Martha C. Smith made this information easily accessible and comparatively accurate. Martha C. Smith was at the time the transaction was closed with the sisters incurably insane and confined to an institution under guardianship. She was then intestate. It does not appear that the defendants were so thoroughly advised. At one time during the negotiations one of the sisters stated, she would like to talk the matter over further with her sister, to which the plaintiff replied: “It isn’t a question of talking £0 anybody. It is, take it or leave it.”
When the papers consummating the transaction were presented to the defendants, they were in the form of an absolute transfer and assignment of a one-half interest of the sisters in the estate of Martha C. Smith. The contract covers two pages, legal cap size, closely typewritten, and accompanied by an affidavit, which, after stating the nature of the defendants’ interest, that defendants have not otherwise disposed of such interest, and that there are no outstanding judgments against them, concludes with the following paragraph:
“That we make this affidavit for the purpose of inducing the said Joseph L. Rosenberg to purchase the said interest, knowing full well that he relies solely and exclusively upon the statements herein contained in inducing him to part with valuable consideration for the purchase of said interest.”
An examination of the contract conveying the interests of the defendants to Rosenberg discloses that it leaves nothing for the defendants now to do. It is a complete sale of the one-half interest of the defendants in the estate of Martha C. Smith. It embodies a power of attorney, authorizing Rosenberg to do everything necessary to consummate the transfer of such interests to himself. There is noth'ing in the contract as drawn requiring specific performance.
It is only because in some cases contracts which amount to com *12 pleted sales, unenforceable in law, may be considered mere executory promises by a chancellor that the relief of specific performance must be considered.
The basic question involved is whether or not this instrument framed in the circumstances noted constitutes a basis for equitable relief.
It has been universally held that assignments of future interests in estate not yet determined are contrary to public policy and unenforceable at law. The law applicable to this situation is found in Hite v Hite, et al., Exrs., 120 Oh St, 253. The syllabus in that case is:
“1. An assignment by an heir apparent or presumptive of his expectancy in the estate of an ancestor is invalid and unenforceable in an action at law, because such a contract lacks one of the essential elements of a valid contract, to-wit, a lawful, subject-matter.
“2. Such a contract is contrary to the policy of our laws and not favored by our courts, because of the danger that one party is defenseless and exposed to the demands of the other under the pressure of necessity.
“3. After the death of the ancestor and the inheritance has become absolute and definable a court of equity will entertain jurisdiction of a suit to enforce performance of the contract and will decree performance if it is shown that no fraud or imposition has been practiced and that thé contract was not made under pressure of necessity and that it is supported by an adequate consideration.”
We are cited to cases in which equity has intervened to do justice, where the law fails of a remedy.' That the facts recited here even remotely suggest the existence of such a predicate for the exercise of the extraordinary power of the chancellor is beyond the realm of reason or justice. As early as the case of Administrators of Benjamin Hough v Hunt, 2 Ohio, 495, our Supreme Court recognized the power of the pressure of necessity. The syllabus in that case is:
“Where a person deeply in debt, to obtain a loan of money, agrees to purchase a tract of land, at-more than double its value, in connection with the loan, and gives a mortgage upon other property to secure the loan and part of the purchase money, the vendor being apprised of the purchaser’s necessities, equity will rescind the contract.”
Chancery, even where the action is founded upon a contract wholly within strict legal limitations, if unconscionable, refuses its aid for enforcement, as will appear in a quotation from Pomeroy shortly following. How much more then will the chancellor recoil from lending his aid when the transaction presented bears all the ear marks of oppression and overreaching, as well as being an agreement unenforceable in law? Of course, it is not denied that the defendants could read and knew the portent of the instruments they signed, but as they said what could they do against the instant pressure of debts and sickness, against being ousted from shelter and thrown into the street.
We quote at length from Pomeroy’s Equity Jurisprudence, Vol. 2, 5th Ed. p. 100:
“I shall now give some examples to illustrate the circumstances under which this principle operates in the administration of equitable relief, and the manner in which it is applied. The first instance which I shall mention is found in the *13 familiar doctrine which controls the equitable remedy of the specific performance of contracts. A contract may be perfectly valid and binding at law; it may be of a class which brings it within the equitable jurisdiction, because the legal remedy is inadequate; but if the plaintiff’s conduct in obtaining it, or in acting under it, has been unconscientious, inequitable, or characterized by bad faith, a court of equity will refuse him the remedy of a specific performance, and will leave him to his legal remedy by action for damages. It is sometimes said that the remedy of specific performance rests with the discretion of the court; but, rightly viewed, this discretion consists mainly in applying to the plaintiff the principle. He who comes into a court of equity must come with clean hands, although the remedy, under certain circumstances, is regulated by the principle. He who seeks equity must do equity (see section 392). The doctrine, thus applied, means that the party asking the aid of the court must stand in conscientious relations towards his adversary; that the transaction from which his claim arises must be fair and just, and that the relief itself must not be harsh and oppressive upon the defendant. By virtue of this principle, a specific performance will always be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, by taking undue advantage of his position, or by any other means which are unconscientious; and when the contract itself is unfair, one-sided, unconscionable, or affected by any other such inequitable features; and when the specific enforcement would be oppressive upon the defendant, or would prevent the enjoyment of his own rights, or would in any other manner work injustice. This application of the principle, better perhaps than any other, illustrates its full meaning and effect; for it is assumed that the contract is not illegal; that no defense could be set up against it at law; and oven that it possesses no features or incidents which could authorize a court of equity to set it aside and cancel it. Specific performance is refused simply because the plaintiff does not come into court with clean hands.”
Note the language of the author: “By virtue of this principle a specific performance will always be refused when the plaintiff has obtained the agreement, by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, by taking undue advantage of his position, or by any other means which are unconscientious;” and be it remembered again the author is considering contracts not against public policy, not unenforceable at law. The plaintiff is here asking this court of equity to do what the law refuses to do. That injustice, inequity, or unconscionable conduct might establish ground for the hand of the chancellor to break furnishes no basis for invoking that relief, When the direct opposite would ensue. If this were a case where the plaintiff had for a long period sustained defendants in distress and was here asking the enforcement of a contract designed merely to recompense such a liberal benefaction, and the defendants were hiding behind mere illegality, some claim to consideration might justly be demanded of the chancellor. No such cause of action is here stated or proved. Were the plaintiff here merely ask *14 ing for just recompense for his loan and interest and the defendants were resisting such demand, a court of equity would undoubtedly give relief. The defendants here tendered in their answer all that may be claimed in justice, the amount of the loan and interest. To decree more is to aid in the recovery of a mere wager, in which full assurance rested with him who now seeks relief.
A decree may be taken in favor of the plaintiff for the amount of the loan and legal interest from its date, upon the surrender by the plaintiff of the instruments of indebtedness, transfers, and powers of attorney, together with the affidavits of the defendants, and the same shall all be considered can-celled and forever void.
The costs shall be assessed against the plaintiff.
MATTHEWS, PJ., concurs.